J-S06005-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BRANDON MEADE | : | |
| | : | |
| | : | No. 3322 EDA 2016 |
| Appellant | | |

Appeal from the Judgment of Sentence September 27, 2016
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0011126-2015

BEFORE:  BOWES, J., McLAUGHLIN, J., and MUSMANNO, J.

MEMORANDUM BY BOWES, J.:                     **FILED JUNE 18, 2018**

Brandon Meade appeals from his judgment of sentence of life imprisonment without parole imposed after a jury convicted him of first-degree murder and possession of an instrument of crime ("PIC").  We affirm.

The trial court offered the following summary of the evidence admitted at trial.

> On August 31, 2015, [Appellant] shot the decedent, Agatha Hall, his girlfriend, one time in the head, killing her and staging the death to appear as a suicide.

> Agatha Badio is the decedent's aunt.  She testified that the decedent, a Liberian refugee, was born in Ghana and moved to the United States in 2005 when she was twelve.  She first lived with her grandmother in Minnesota before moving to Philadelphia to start the 10th grade and live with one of Badio's brothers, the decedent's uncle.  Badio had spoken with the decedent for the last time a few days before her murder and testified that she was planning to come to Minnesota to visit her family in the week following her death.  According to Badio, the decedent was happy the last time she spoke to her and in the months preceding her

murder. She testified that she had received a phone call from her mother (the decedent's grandmother) on August 31, 2015 informing her that "Kiwi" (Badio's nickname for the decedent) was dead. After receiving the phone call, Badio flew to Philadelphia from Minnesota to identify the decedent's body.

Robert Lay testified that he is a registered coordinator at Temple University. He was a friend of the decedent. They met in the fall of 2014 and commenced a sexual relationship which lasted for that semester and after which they remained friends. Lay described the decedent as "very bubbly . . . always smiling, always joking." After that semester, during the winter break, the decedent had gone to Australia to see her mother, who was ill. Her mother passed away during the trip. Lay kept in touch with the decedent while she was in Australia and testified that, although she was upset about her mother's death, she was also relieved that her mother's illness was over and was "back to her bubbly state" upon returning from the trip. Lay added that the decedent did not want to continue seeing him after the trip because she had entered into a relationship with someone else.

Lay testified that they did have one more sexual encounter about a month after she started this new relationship. Two or three days after this encounter, he received a frantic phone call from the decedent. She sounded scared and worried; she told him that her boyfriend had gone through her text messages, and she kept asking if her boyfriend had tried to contact him. The second-to-last phone call between Lay and the decedent took place at the end of June, 2015. At the time of the phone call, the decedent seemed very happy and she said she was doing very well. Their final phone call was a Sunday night in late August, 2015. Lay was returning a call from the decedent that he had missed the night before. She initially seemed calm but then started whispering "call you back, call you back" and gave Lay the impression that she was worried, scared, and that there was something wrong before she hung up. After this phone call, he received a phone call from the decedent's number but it was a man who was yelling at him, cursing, and threatening him. Lay testified that: "He said 'ni**er' a lot. . . . He said you are the person who was fu**ing Agatha last year. I read your text messages. She is the one who sucked your d*ck . . . the male on the phone just kept saying I know who you are. I hope you graduate and move far, far away because I am going to see you when I see you ni**er." The following day, upon hearing that the

decedent had committed suicide, Lay went to Temple Police Station and gave them a statement because he did not think the decedent had killed herself.

Abigail Osei-Tutu was the decedent's roommate. She testified that she moved into the two-bedroom apartment where the murder occurred in August of 2014. Osei-Tutu told the [c]ourt that there was a back door leading to the outside from the decedent's rear bedroom which was always locked and that it was only possible to open it from the inside. That back door led to a flight of outside steps which ended in the back yard. She also testified that one could lock their bedroom doors from the inside without a key, but you needed a key to open them from the outside (*i.e.* in the hallway).

Osei-Tutu testified that the condition of the decedent's bedroom as shown in the photographs taken of the scene was not how the decedent kept it; rather, it was much too messy. The mirror on the wall, which was crooked, was not how the decedent would have left it, and there were never clothes or any other items on the back outside stairs until the night of the murder. She identified a basket on the back stairs as the decedent's hamper. She had never noticed a bullet hole in the decedent's bedroom wall prior to the murder. Osei-Tutu knew [Appellant] as the decedent's boyfriend, whom the decedent had started dating upon returning from Australia in the winter of 2015.

Osei-Tutu testified that the decedent had been considering marrying a friend so that he would not lose his visa, but after the decedent spoke to [Appellant] about it on the phone, the decedent spent the rest of the evening crying and very upset. Osei-Tutu went to the decedent's room and found it locked, so she knocked and told the decedent to open her door. When the decedent opened her door, she was still crying and she went to her bed and put about five over-the-counter (*i.e.* Tylenol, etc) painkillers in her mouth and then spit them right back out. A couple of days after this incident, the decedent seemed normal to Osei-Tutu and was excited about the start of the fall semester.

Osei-Tutu testified that on August 31, 2015, she and her boyfriend, Daniel Boateng, were returning to her apartment from a Kevin Hart show when they encountered [Appellant] opening the door to the vestibule (from the hallway), apparently on his way out of the building. He appeared startled, did not say anything to

Osei-Tutu or her boyfriend, turned around, and started banging on the decedent's bedroom door saying: "Agatha, open the door! Agatha, open the door! . . . I forgot my gun in there. Agatha, if you don't open the door, I'm going to get my people after you!" Osei-Tutu and Boateng went to the former's room and sat on her bed. Within a few seconds, [Appellant] stopped banging on the door and, a few seconds after that, Osei-Tutu and Boateng heard a gunshot. After the gunshot Osei-Tutu testified that she heard [Appellant] start yelling "Why did she do that? Why did she do that? Oh my god!"

After the gunshot, Boateng pushed Osei-Tutu into her closet to prevent her from leaving the apartment and possibly being injured. [Appellant] then came into her room, still yelling, and put his arms around Boateng. Boateng pushed [Appellant] away and Osei-Tutu ran out of the apartment when she realized [Appellant] did not have his gun on his person. Boateng followed closely behind and they ran out of the building. Osei-Tutu called the police to report that the decedent had shot herself because that was what [Appellant] told her had happened. Osei-Tutu went to the police station with the police that morning and gave a statement, which she reviewed and signed. She gave an additional two statements to homicide detectives: one on September 9, 2015 and another on May 3, 2016.

Daniel Boateng testified that he is the boyfriend of Abigail Osei-Tutu. He described the decedent as a very easy-going and joyful person. He knew [Appellant] to be the decedent's boyfriend but, outside of the night of the murder, he had only seen him one other time. Boateng testified that he and Osei-Tutu were returning home from a Kevin Hart show when they ran into [Appellant] at the 2nd interior (vestibule) door to the apartment. [Appellant] seemed startled and said that he had forgotten something in the decedent's room and was going to walk back with them to get it.

Boateng and Osei-Tutu went to Osei-Tutu's room and closed the door. [Appellant] went to the decedent's bedroom door, knocked loudly, and said "I forgot my gun. Open the door. I am going to get my people on you if you don't open the door." [Appellant] was shouting at a very high volume and Boateng never heard the decedent's voice while [Appellant] was knocking on the door. After the door opened, Boateng heard a very slight murmur (the gender of which he could not determine) and then a gunshot.

- 4 -

After he heard the gunshot, Boateng pushed Osei-Tutu into her closet because he did not know who was shot or who had a gun and he did not want her to run out of the room. [Appellant] then came into the room and put his arms around Boateng saying "She killed herself!" at which point Osei-Tutu ran out of the room while telling Boateng to run. Boateng pushed [Appellant] away and followed Osei-Tutu, noticing that [Appellant] had left blood stains on the top of his shirt. When they exited the room [Appellant] was flailing on Osei-Tutu's bed saying: "I can't believe she did that to herself!"

Giselle Spencer, a close friend of the decedent, testified that she had known the decedent for three years. She and the decedent had worked together at the Wawa on 11th and Arch Streets. The decedent continuously told Spencer that [Appellant] had a temper and did not trust her. On May 29, 2015, the decedent called her sounding hysterical. The decedent told her that [Appellant] had found messages on her phone from another male and that they had had a big fight, after which [Appellant] had slammed her against a wall. The decedent asked to stay at Spencer's house. Spencer testified that, while at her house, the decedent took a photo of the two of them and posted it to Instagram. The decedent told Spencer that she had to do this because [Appellant] would not trust that she was staying at Spencer's house.

Spencer further testified that, in the summer of 2015, she went to the mall with the decedent and [Appellant]. Spencer and the decedent were walking together and [Appellant] followed behind them. Two males came out of a store and made flirtatious remarks directed at the decedent. [Appellant] walked up and lifted his shirt revealing a gun to the males. The decedent asked Spencer to go get [Appellant] away from the males because he had a bad temper.

Spencer testified that she hung out with the decedent about a week before she was murdered when they went to a hookah bar and bowling. She testified that the decedent was happy and excited about starting school the following week and finishing college.

Officer Matthew Market of the Philadelphia Police Department testified that, at around 12:35 a.m. on August 31, 2015, he received a police radio call reporting that a person had

been shot at the corner property at 2300 Park Avenue and York Street (which is East of Broad Street, just off of the Temple University campus). He was only a few blocks from the location of the murder at the time and arrived within minutes. When he arrived there were several men and women standing outside of the house in question, including Officer [Julie] Waymack, Abigail Osei-Tutu, Daniel Boateng, and [Appellant].

Officer Market testified that he and Officer Waymack first tried the front door of the house but were informed by the people standing outside that they had locked themselves out. He and Officer Waymack then quickly went to the back of the house and tore down part of a stockade fence so that they could access the back door and get to the decedent as they did not know the extent of her injuries. Officer Market observed that [Appellant] was not helping to get into the apartment; instead he was standing in front of the building and yelling "Why did she do that? Why? Why? Why?" Officer Market found the back door unlocked and that the stairs leading from the door to the back yard were strewn with clothes and objects that appeared to have been thrown there. By this time [Appellant] had moved from the front of the house to 8-10 feet behind Officers Market and Waymack and was still acting hysterical.

Officer Market testified that when he entered the apartment there were clothes and debris scattered around. He also noticed that a mirror on the wall was tilted. He pulled an Ikea-style dresser off of the decedent and found her in a fetal position, laying on her left side with a pink towel wrapped around her waist. She was bleeding profusely from a wound on her forehead and there was a pool of blood on the floor. She had no pulse. Officer Market found a gun with blood on it laying next to the decedent.

Officer Market testified that the front door to the bedroom, which led to the first floor hallway, was locked from the inside. It was not a deadbolt, which requires a key to lock from the outside, but a door handle lock that could be locked by someone on their way out without a key. He found one fired cartridge casing (FCC) in the middle of the bed among some clothes and noticed a bullet hole in the wall about four feet above the bed. When [Appellant] was brought to the district precinct for questioning, he continued to act hysterical and rolled on the floor in the hallway.

Officer Gary Guaraldo, a member of the Crime Scene Unit, testified that at 1:28 p.m. on the afternoon of September 3, 2015, he was called by the Homicide Division and asked to process the scene at 2359 North Park Avenue. Officer Guaraldo testified that there was a bullet hole in the rear bedroom wall, 6 feet and 4 inches from the floor. In order to find whatever bullet fragments may have remained, Officer Guaraldo removed the sheetrock around the bullet hole and removed the insulation between the sheetrock and the cinderblock of the exterior wall. When this proved fruitless, he ran a metal detector over the insulation he had removed and recovered the lead core and part of the copper jacket from the projectile.

Officer Willie Roundtree testified that he and his partner, Officer [Jonathan] Mangual, responded to a police radio call at 12:35 a.m. on the morning of August 31, 2015. Officer Roundtree testified that when he arrived on the scene, [Appellant] was pacing back and forth in the back yard of the property and tried to walk away when approached by Officers Roundtree and Mangual. Officer Roundtree testified that he asked [Appellant] if he was okay and [Appellant] said "No, that was my baby." Officer Roundtree then asked if the decedent was suicidal before and [Appellant] said: "No, she never was. Am I able to leave? Am I able to leave? That was my baby. Oh my God, oh my God." Officer Roundtree asked [Appellant] if he and the decedent had had an argument that day and [Appellant] said that they had had "a little argument but we was at the beach all day and it wasn't nothing that serious." When Officer Roundtree asked [Apellant] what the argument was about, [Appellant] said: "Oh my God, my baby, my baby, why would she do that to herself? Why did she do that to herself?" At this point Officer Roundtree's partner suggested taking [Appellant] to the detectives to give a statement and [Appellant] threw himself on the ground and loudly said: "My baby, my baby. I just want to leave. I just want to go!"

Officer Jonathan Mangual testified that [Appellant] repeatedly asked if he could have his gun back before being placed in the patrol car at the scene of the murder. In a statement of Officer Mangual's which was read into the record by the Commonwealth, he stated that he had wanted to take [Appellant] to the Homicide Division because of his suspicious behavior, repeated requests for his gun, and his desire to get back into the decedent's room to retrieve it.

Detective Neal Goldstein of Central Detectives testified that in the early morning hours of August 31, 2015, he was assigned to investigate the reported suicide of a young woman at 2359 North Park Avenue. He identified photos he took of the crime scene when he first arrived and testified that he submitted the 9mm FCC found on the bed to the Firearms Identification Unit. No suicide note was found at the scene. Detective Goldstein testified that the case was transferred from Central Detectives to Homicide on September 3, 2015.

Detective Richard Bova testified that he interviewed [Appellant] at Central Detectives at 2:30 a.m. on the morning of August 31, 2015. After the interview [Appellant] reviewed the statement for errors and signed his name at the bottom. Detective Bova read the statement in its entirety into the record. In it, [Appellant] stated that the day before the murder he and the decedent had taken a day trip to Rehoboth Beach, Delaware in her car. When they returned to her apartment they got into an argument because he had to leave to take care of his grandfather and she was upset because of losing her mother earlier in the year and losing a cousin in Africa that week. [Appellant] stated that when he was leaving he ran into the decedent's roommates on the way out and told them he had to go back to her room to get his gun. When he got to her door, the decedent kept saying that [Appellant] didn't care about her. He then heard a shot and went into her room and found her on the ground. [Appellant] stated that he "grabbed her head" but otherwise did not touch her. He also stated that he did not touch his gun.

Homicide detective Nathan Williams testified that he was assigned to investigate the suspicious death of the decedent on September 3, 2015 and that the decedent's death was changed from the "suspicious" category to "murder" on the 14th or 15th of September, 2015.

Dr. Sam Gulino, the Chief Medical Examiner for the City of Philadelphia, testified that the decedent was pronounced dead by the paramedics at 2539 North Park Avenue at 12:49 a.m. on August 31, 2015. After reviewing all of the files and photographs related to the autopsy of the decedent, Dr. Gulino testified that, within a reasonable degree of scientific certainty, that her cause of death was a gunshot wound to the head and her manner of death was homicide. The decedent had an entrance gunshot wound on her left forehead directly below the hairline and

surrounding the wound were multiple stippling marks, which are caused by particles of unburned gunpowder striking the skin when a gun is fired less than 2.5-3 feet from the recipient of the bullet. Dr. Gulino testified that the gun that fired the bullet that killed the decedent was fired at a distance of one to three feet from the decedent's head. The bullet, in four fragments, was recovered from the left, back part of the decedent's brain. The decedent had no drugs or alcohol in her system at the time of death. Dr. Gulino testified that none of the features of the decedent's case were typical of a suicide and that suicidal gunshot wounds are almost always contact wounds, which this was not.

Ms. Ann Marie Barnes, Firearms Examiner with the Philadelphia Police Department, testified that she conducted examinations of the bullet fragments removed from the decedent's skull, the projectile fragments found in the decedent's bedroom wall, the FCC recovered from the decedent's bed, and [Appellant]'s 9mm handgun. Based upon her microscopic investigations, Ms. Barnes determined that the bullet fragments found in the decedent's skull and the FCC found on the decedent's bed were fired from [Appellant]'s 9mm Ruger gun. The bullet from the wall and the bullet recovered from the decedent both had full metal jackets made from copper alloy material. The shot that killed the decedent was fired from a distance of fifteen (15) to twenty-two (22) inches from her head. After determining that distance based on the stippling and the medical examiner's report, Ms. Barnes also physically confirmed the results by measuring the body of the decedent at the Medical Examiner's office.

Ms. Barnes testified that the ejection port on [Appellant's] gun was on the right side, meaning that the FCCs would discharge to the right of the person holding the gun. If [Appellant] was standing above the decedent when he fired the gun at her, the FCC would have likely discharged onto the bed, which is where it was found. Ms. Barnes took distance determination test shots with [Appellant's] 9mm Ruger gun at distances of 4, 6, 8, 10, 12, 14, 16, 18, 20, 22, and 24 inches in order to determine the distance of the muzzle of the gun from the decedent. Ms. Barnes discussed the results of each distance determination test individually to emphasize to the jury how anything below 15 inches distance from the muzzle of the gun to the decedent's head would not have matched the diameter and particulate matter density of the stippling pattern on the decedent's head. The 18 to 22 inch distance determination range was the closet match to

the stippling pattern on the decedent's head. Ms. Barnes testified that, after examining the body of the decedent, she determined that the farthest distance the decedent could have possibly held the muzzle of the gun from her head, when considering the decedent's arm length, was between 13.75 and 14 inches.

Trial Court Opinion, 6/13/17, at 2-16 (footnote and citations omitted).

Upon this evidence, a jury convicted Appellant of murder in the first degree and PIC. He was sentenced on September 27, 2016, to life imprisonment without the possibility of parole for the murder conviction, and no further penalty on the PIC. Appellant filed an untimely post-sentence motion on October 11, 2016, and a timely notice of appeal on October 18, 2016. On November 28, 2016, the trial court entered an order denying the post-sentence motion. Following the appointment of new counsel for the appeal, both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant presents to this Court the following questions, which we have re-ordered for ease of disposition.

I. Whether the evidence was insufficient to sustain verdicts of first[-]degree murder and PIC because even after giving the Commonwealth the benefit of viewing the evidence in a light most favorable to it as the verdict winner the Commonwealth did not prove beyond a reasonable doubt that the Appellant possessed the necessary malice for murder or that he possessed the firearm with the intent to employ it criminally.

II. Whether the verdict for murder was against the weight and credibility of the evidence and shocks one's sense of justice where there was evidence of the victim's depressed state due to the loss of her mother, where there was evidence that the victim had previously attempted suicide and where the evidence was slight and incredible and was rebutted that the Appellant had staged a scene to cover up a murder.

III. Whether the court erred when it admitted evidence of the Appellant's prior alleged gun incident at the King of Prussia Mall under Rule 404(b) as a relevant bad act to prove the motive of jealousy where the evidence was more prejudicial than probative because the alleged brandishing of the gun was not directed toward the victim and was not probative of the Appellant's having possessed the necessary malice for murder.

Appellant's brief at 6.

We begin with the law applicable to Appellant's claim that the evidence was insufficient to sustain his convictions.

> Because a determination of evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

***Commonwealth v. Williams***, 176 A.3d 298, 305-06 (Pa.Super. 2017) (citations and quotation marks omitted).

Appellant was convicted of first-degree murder and PIC.

> An individual commits first-degree murder when he intentionally kills another human being; an intentional killing is defined as a willful, deliberate and premeditated killing. To sustain a conviction for first-degree murder, the Commonwealth must prove that: (1) a human being was unlawfully killed; (2) the accused was

responsible for the killing; and (3) the accused acted with malice and a specific intent to kill. A jury may infer the intent to kill based on the accused's use of a deadly weapon on a vital part of the victim's body.

*Id*. at 306-07 (internal citations and quotation marks omitted). "A person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally." 18 Pa.C.S. § 907(a).

Appellant argues that the Commonwealth failed to prove that he specifically intended to kill Ms. Hall. He contends that it is "mere speculation" how Appellant's gun was fired in her room. Appellant's brief at 29. He claims that the conclusion that Ms. Hall was shot during a struggle "designed to prevent Ms. Hall from harming herself" is just as likely an inference from the fact that her room was in disarray as any other conclusion. *Id*. He notes that the evidence of his past incidents of jealous rage were directed at others, not at Ms. Hall. *Id*. Appellant avers that the fact that it was physically impossible for Ms. Hall to have inflicted the gun wound herself "does not eliminate that Ms. Hall was killed during a moment of heated passion." *Id*. Further, Appellant contends that, because the Commonwealth did not prove that he committed the crime of murdering Ms. Hall, there was insufficient evidence to sustain his PIC conviction, as Appellant legally owned and carried his firearm. *Id*. at 30.

Appellant's sufficiency claim has no merit. As an initial matter, Appellant seeks to have this Court view the evidence in the light most favorable to himself. That is contrary to our standard of review. *See Williams*, *supra*.

- 12 -

Properly viewing the evidence in the light most favorable to the Commonwealth, we conclude that the following evidence clearly permitted the jury to infer that Appellant intentionally shot and killed Ms. Hall. Ms. Hall was shot in a vital part of the body. ***See***, ***e.g.***, ***Commonwealth v. Haney***, 131 A.3d 24, 36 (Pa. 2015) (discussing head as vital part of the body). Mr. Boateng testified that he heard the door to Ms. Hall's room open, following Appellant's knocking, before the shot was fired. N.T. Trial, 9/22/16, at 109. However, Appellant told the police that he was outside of Ms. Hall's room when he heard the shots fired. N.T. Trial, 9/21/16, at 174. The fatal shot was fired from fifteen to twenty-two inches away from her head, and, based upon the length of her arms and the size of the gun, she was unable to shoot herself from that distance. N.T. Trial, 9/23/16, at 89-90; N.T. Trial, 9/26/16, at 20-26.

Rather than being the product of speculation, the jury's verdict reflects wholly logical inferences that Appellant, angry about Ms. Hall's relationship with Mr. Lay, intentionally shot her in the head and then told different lies about how it happened in an attempt to hide his guilt. As such, Appellant's sufficiency challenges merit no relief.

Appellant next argues that his convictions are against the weight of the evidence. In order to preserve a claim that the verdict was against the weight of the evidence, a defendant must present it in a timely post-sentence motion or raise it "orally on the record or in writing prior to sentencing."

***Commonwealth v. Ford***, 141 A.3d 547, 556 (Pa.Super. 2016). Here, as noted above, Appellant's post-sentence motion was not timely, and he filed his notice of appeal before the trial court ruled upon it. Nor does the record reveal that he raised the claim prior to sentencing. Accordingly, Appellant waived appellate review of his weight-of-the-evidence challenge to the verdict. ***See Commonwealth v. Thompson***, 93 A.3d 478, 490-91 (Pa.Super. 2014) (finding weight claim waived, although the trial court addressed it in its Rule 1925(a) opinion, where the claim was not raised before the appeal such that the trial court had jurisdiction to provide the relief requested).

Finally, we consider Appellant's evidentiary challenge, mindful of our standard of review.

> The admissibility of evidence is a matter addressed solely to the discretion of the trial court, and may be reversed only upon a showing that the court abused its discretion. For there to be abuse of discretion, the sentencing court must have ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

***Commonwealth v. Johnson***, 179 A.3d 1105, 1119-20 (Pa.Super. 2018) (internal citations and quotation marks omitted).

Appellant contends that the evidence that he had showed his gun to the two men who flirted with Ms. Hall at the mall should have been excluded under Pa.R.E. 404(b). That Rule provides as follows.

**(b) Crimes, Wrongs or Other Acts.**

- 14 -

> *(1) Prohibited Uses*. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> *(2) Permitted Uses*. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa.R.E. 404(b). "The admission of [404(b)] evidence becomes problematic only when its prejudicial effect creates a danger that it will stir such passion in the jury as to sweep them beyond a rational consideration of guilt or innocence of the crime on trial." *Commonwealth v. Diehl*, 140 A.3d 34, 41 (Pa.Super. 2016).

The Commonwealth's theory was that Appellant's motive in killing Ms. Hall was jealousy. Consequently, the trial court determined that "evidence of [Appellant's] jealously and possessiveness with regard to the decedent was highly probative of motive." Trial Court Opinion, 6/13/17, at 15. After balancing this high probative value with the potential for unfair prejudice, the trial court found that the evidence was admissible, explaining as follows.

> While it might seem reasonable for a boyfriend to feel jealousy as a reaction to two males making flirtatious remarks towards his girlfriend, it is completely unreasonable and beyond the norm for that reaction to be brandishing a weapon towards the two males. Evidence was presented at trial indicating that [Appellant] called Robert Lay from the decedent's phone, minutes prior to the murder, screaming at him and threatening him. . . . The episode at the mall, viewed in concert with this phone call and other evidence of [Appellant's] jealousy presented at trial (his angry reaction to the decedent being in a car with another male, the decedent having to post a picture to Instagram to prove she was

at her friend's house), establishes jealousy as the motive for [Appellant's] murder of the decedent.

Trial Court Opinion, 6/13/17, at 15-16.

Appellant maintains that the trial court's reasoning is flawed. Appellant contends that the testimony of Mr. Lay, Ms. Spencer, and Ms. Osei-Tutu was ample evidence for the Commonwealth to offer jealousy as a motive without the prejudicial evidence of the mall incident. Appellant's brief at 21. Further, he argues that "[i]t does not logically follow that if Appellant had brandished his weapon at two third parties he would necessarily use the weapon to harm his lover in a fit of jealousy." *Id*. at 21. We disagree.

First, Appellant's suggestion that evidence must necessarily establish a fact to make it relevant is incorrect. To be relevant, evidence does not have to establish a fact of consequence to an absolute certainty; rather, it need only have "any tendency" to make the fact "more or less probable than it would be without the evidence." Pa.R.E. 401(a).

Second, the evidence in question was highly probative, and not merely cumulative of the other testimony about Appellant's jealousy. The incident at the mall, unlike the other evidence of Appellant's jealousy, connects his feelings of jealousy with his reaching for his gun. While the men at the mall were present to be the object of Appellant's jealous anger at the time he felt it, Mr. Lay was not present when Appellant confronted him about his relationship with Ms. Hall. However, Ms. Hall was there, and she was shot by Appellant's gun minutes after Appellant verbally assaulted Mr. Lay.

Third, while it certainly did not cast Appellant in a good light, the testimony that Appellant responded to two men's flirtations with Ms. Hall by walking up to them and lifting his shirt to reveal his gun is not such that "its prejudicial effect creates a danger that it will stir such passion in the jury as to sweep them beyond a rational consideration of guilt or innocence of the crime on trial." *Diehl*, *supra* at 41.

Accordingly, the trial court did not abuse its discretion in admitting the evidence regarding Appellant's brandishing of his gun at the mall. *See*, *e.g.*, *Commonwealth v. Arrington*, 86 A.3d 831, 844 (Pa. 2014) (affirming admission of evidence under Rule 404(b) against defendant accused of murdering his girlfriend, that the defendant, "attacked the brothers of prior girlfriends harmed or threatened to harm members of his girlfriend's family or male acquaintances that he viewed as romantic rivals").

For the foregoing reasons, Appellant is entitled to no relief from this Court.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/18/18